UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:14-CV-00619-TBR

DOUGLAS W. GREENE                                                    PLAINTIFF

v.

FROST BROWN TODD, LLC., *et al.*                              DEFENDANTS

## Memorandum Opinion

This case and its companion cases, *Greene v. IPA/UPS System Board of Adjustment, et al.*, No. 3:15-CV-00234, and *Greene v. Independent Pilots Association, et al.*, No. 3:14-CV-00628, arise from Plaintiff Douglas W. Greene's termination from his employment as a pilot for United Parcel Service Co.   In this case, Greene seeks to recover from Frost Brown Todd, LLC (FBT) and two of its attorneys, Tony Coleman and Mark Sommer, for their conflict of interest in representing both UPS and Greene at the same time.   Currently before the Court is Defendants' motion for summary judgment.   [DN 15.]   Greene has responded, [DN 35], and Defendants have replied, [DN 46].   This matter is now ripe for adjudication.   As explained more fully below, Defendants' motion for summary judgment [DN 15] is GRANTED.

Greene advances two theories of legal malpractice in this case.   First, he alleges that Defendants' conflict of interest made UPS aware of the Kentucky Department of Revenue investigation, causing UPS to terminate his employment. While FBT and its attorneys did indeed have a conflict of interest in representing both Greene and UPS, Greene cannot establish that the Defendants' conflict of interest caused his termination from UPS.   In *Greene v. IPA/UPS System Board of*

*Adjustment, et al.*, No. 3:15-CV-00234, this Court upheld the System Board's determination that UPS had just cause to terminate Greene for his failure to submit to a required medical examination.   Because the System Board's Award is entitled to preclusive effect in this case, Greene cannot establish that UPS terminated his employment because of the tax investigation, which he must do to prevail against these Defendants.   Additionally, the unchallenged evidence of record demonstrates that UPS was aware of the tax investigation well before Defendants' conflict of interest ever arose.   Second, Greene alleges that but for Defendants' conflict of interest, his tax dispute would have been resolved more expeditiously.   With respect to this theory, Greene brings forth no expert testimony showing that Defendants' failure, if any, to diligently pursue his tax matters caused him to suffer damages.   Because such testimony is required to prove a legal malpractice claim under Kentucky law, Greene's second theory of causation must also fail.

## I. Facts and Procedural History

Plaintiff Douglas Greene is a commercial airline pilot, formerly employed by UPS.   He was terminated from that employment in 2013 after he refused to submit to a medical examination.   Greene's 2013 termination proceedings gave rise to three lawsuits.   In the first, *Greene v. Independent Pilots Association, et al.*, No. 3:14-CV-00628, Greene alleges that IPA, the union that represents UPS's pilots, failed to fulfill its duty of fair and adequate representation.   In *Greene v. IPA/UPS System Board of Adjustment, et al.*, No. 3:15-CV-00234, Greene seeks to overturn

2

the arbitration that concluded UPS had just cause to terminate him under the terms of the UPS-IPA Collective Bargaining Agreement (CBA). Finally, in this case, Greene claims that Defendants had a conflict of interest that ultimately caused his 2013 termination.

On or about March 25, 2010, UPS received a subpoena from a Jefferson County grand jury. [DN 15-2.] That subpoena required UPS to provide "a certified copy of all United Parcel Service records that specifically address and establish the Louisville assigned domicile at which crew members are based." [*Id.* at 1.] A second subpoena arrived on or about June 22, 2010, requesting "a certified copy of employee records for all years available for Douglas Greene." [DN 15-3 at 1.] UPS received a third subpoena also pertaining specifically to Greene in September 2010. [DN 15-6.] Defendant Tony Coleman, an attorney practicing at Frost Brown Todd, admits that he represented UPS during this time frame, *see* [DN 15-4 at 1], and responded to the Greene subpoenas on UPS's behalf, [DN 15-5; DN 15-7]. The subpoenas related to an ongoing Kentucky Department of Revenue investigation into the tax filings of UPS pilots. UPS's worldwide air cargo operations are based in Louisville, Kentucky. [DN 15-8 at 8.] Kentucky authorities believed that some UPS pilots, including Greene, were domiciled in the Commonwealth, but were not paying the correct amount of state income taxes. *See* [DN 15-4 at 2; DN 15-9 at 1.] Greene, an Alaska resident at the time, disputed Kentucky's tax assessment against him. Ultimately, Greene and the other UPS

pilots were successful in fending off the Kentucky Department of Revenue.   [DN 15-8 at 13.]

While the tax investigation continued, UPS began termination proceedings against Greene in March 2011, following Greene's verbal confrontation with a supervisor.   [DN 36-6.]   Coleman and FBT represented UPS during Greene's 2011 termination.   [DN 15-4 at 2.]   Importantly, Coleman claims that "[d]uring the 2011 termination proceedings, it was disclosed and all parties were aware of Greene's issues with the Kentucky Department of Revenue and Commonwealth Attorney related to the nonpayment of taxes."   [*Id*.]   Additionally, in conversations with UPS officials leading up to Greene's 2013 termination, discussed below, Greene admitted that the tax investigation was brought up during his 2011 termination.   [DN 15-8 at 27.]   Ultimately, the 2011 termination was settled, and Greene remained employed at UPS.

In late 2012, the Kentucky tax investigation was still ongoing.   In an effort to resolve the dispute, Greene hired Defendant Mark Sommer to represent him on or about December 13, 2012.   *See* [DN 15-9; DN 15-10.]   At that time, Sommer was an attorney at Bingham Greenebaum Doll LLP.   *See* [*id*.]   In February 2013, however, Sommer left that firm and joined FBT, as he indicated to Greene by letter. [DN 15-11.]   Sommer continued to represent Greene after his transition, as evidenced by Sommer's correspondence with various Kentucky Department of Revenue and Jefferson County Commonwealth's Attorney officials.   *See* [DN 15-13.]   Apparently, Defendants did not realize at this time that FBT's 2011

4

representation of UPS had been adverse to Greene.   Sommer's representation of Greene continued until October 17, 2013, when Greene terminated Sommer and FBT by letter.   [DN 15-9 at 2; DN 1-5 at 2.]

In 2013, UPS began a second round of termination proceedings against Greene.   The facts giving rise to Greene's 2013 termination are more fully detailed in the System Board of Adjustment's Opinion and Award, [DN 15-8], and in this Court's Memorandum Opinion in *Greene v. IPA/UPS System Board of Adjustment, et al.*, No. 3:15-CV-00234.   In short, on March 19, 2013, Greene was riding along in the jump seat of a Federal Express flight from Memphis, Tennessee to his home in Anchorage, Alaska.   [DN 15-8 at 14.]   At the conclusion of that flight, a FedEx security officer "confiscated a pair of small scissors with pointy ends" from Greene's personal belongings.   [*Id*. at 14-15.]   The scissors were not prohibited by Transportation Safety Administration guidelines, but FedEx's internal security protocols barred their possession.   [*Id*. at 15.]   Eventually, Greene's supervisors, including UPS System Chief Pilot Roger Quinn, decided that a notation of the incident should be placed in Greene's UPS employee history, known as the Exception History Report (EHR).   [*Id*. at 16-19.]

Believing that the EHR notation was unwarranted, Greene spent the summer attempting to have the notation removed, but Chief Pilot Quinn eventually decided that it would remain.   [*Id*. at 18-19.]   Greene's reaction to the scissor incident and the EHR notation caused his UPS supervisors to become concerned about his behavior, and an internal investigation followed.   During its

5

investigation, UPS discovered that Greene had been secretly recording his conversations with company officials. [*Id*. 22-23.] The nature and contents of those taped statements, as well as Greene's allusion to using painkilling drugs to manage a lingering back injury, caused Chief Pilot Quinn to place Greene on paid administrative leave. [*Id*. at 32.] Under the terms of the Collective Bargaining Agreement, UPS ordered Greene to undergo a special medical exam to determine whether he was fit to fly. [*Id*. at 35.] Greene thrice refused to submit himself to the medical exam, believing UPS did not have the contractual right under the CBA to order him to take the exam. [*Id*. at 36-38.] Following these refusals, Chief Pilot Quinn terminated Greene for insubordination on November 22, 2013, and termination proceedings ensued.

During UPS's second termination of Greene, Coleman and FBT once again represented UPS, beginning on or about August 22, 2013. [DN 15-4 at 2.] As noted above, Sommer's representation of Greene in the tax matter did not cease until October 17, 2013, when Greene terminated the representation because of the conflict of interest. [DN 15-9 at 2; DN 1-5 at 2.] Thus, for nearly two months, Coleman, a FBT attorney, represented UPS in its termination of Greene, a FBT client.

Under the UPS-IPA Collective Bargaining Agreement and the Railway Labor Act, employment grievances such as Greene's must be submitted to binding arbitration before a System Board of Adjustment. In termination cases, the System Board consists of two UPS members, two IPA members, and a neutral third-

party arbitrator.   Greene's labor arbitration was originally scheduled to begin in January 2014.   However, before the arbitration began, counsel for IPA, Irwin Cutler, objected to Coleman's representation of UPS because of FBT's conflict of interest.   Coleman withdrew from representing UPS on January 13, 2014, *see* [DN 15-14], and UPS retained other counsel. Eventually, the System Board of Adjustment held Greene's arbitration on September 15-17, 2014, in Louisville, Kentucky.   [DN 15-8 at 2.]

In a decision authored by Arbitrator Barry Winograd, the System Board determined that UPS had just cause to terminate Greene for insubordination. Particularly, Winograd found that UPS conducted a "sufficiently fair and thorough" investigation, [*id.* at 46], and pointed to several facts constituting "objective evidence" of Greene's medical issues: his acknowledgment of a longstanding back injury, his use of painkilling drugs to treat that injury, his "unrelenting and wildly speculative" statements during discussions with UPS's managers, and his fixation on the scissor incident and EHR notation.   [*Id.* at 49-51.]   Because UPS had objective evidence indicating Greene was experiencing medical problems that could impair his ability to fly, its directive that Greene submit to an additional medical exam was justified under the CBA.   [*Id.* at 49.]

Shortly before the arbitration hearing, Greene filed the instant action.   [DN 1.]   In his complaint, Greene alleges, "But for the negligence of Defendants, [his] personal matters would not have been known to UPS and used against him in his termination matter, and [he] would have been more likely successful in mediating

7

his conflict with UPS and avoiding termination." [*Id.* at 5-6.] Additionally, Greene claims that "[b]ut for the conflict of interest, [his] dispute with the Kentucky Department of Revenue would have been more vigorously pursued by Mr. Sommer and more expeditiously resolved." [*Id.* at 6.] Greene named as defendants Frost Brown Todd, LLC, Mark Sommer, and Tony Coleman. [*Id.* at 1.] Defendants answered, [DN 9], and then moved for summary judgment, [DN 15]. Greene responded, [DN 35], and Defendants replied, [DN 46]. Fully briefed, this matter is now ripe for adjudication.

## II. Standard of Review

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"

*Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the parties moving for summary judgment, Defendants must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Greene's claim.   Fed. R. Civ. P. 56(c); see *Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).   Assuming Defendants satisfy their burden of production, Greene "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."   *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### III. Discussion

By representing Douglas Greene in his tax investigation and UPS in Greene's termination proceedings at the same time, Defendants had a conflict of interest. However, to recover from Defendants for legal malpractice, Greene must prove not only that Defendants had a conflict of interest, but also that Defendants' conflict was the proximate cause of his harm.   Greene first contends that UPS terminated his employment because of Kentucky's investigation into his personal tax matters, and that Defendants' conflict of interest caused UPS to become aware of that investigation.   But in upholding Greene's termination, the System Board of Adjustment determined that Greene was dismissed for insubordination.   That finding is entitled to preclusive effect in this case, and prevents Greene from establishing that Defendants' conflict caused his harm.   Greene also argues that

9

his tax dispute would have been resolved more quickly in the absence of Defendants' conflict of interest.   On this theory, he brings forth no expert evidence, as is necessary to prove this kind of professional negligence under Kentucky law. Therefore, Defendants are entitled to summary judgment on Greene's sole claim.

The elements of a legal malpractice claim in Kentucky mirror those of a traditional negligence case.   The plaintiff must prove "(1) that there was an employment relationship with the defendant/attorney; (2) that the attorney neglected his duty to exercise the ordinary care of a reasonably competent attorney acting in the same or similar circumstances; and (3) that the attorney's negligence was the proximate cause of damage to the client."   *Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003) (internal quotation marks and citation omitted). "A legal malpractice case is essentially a 'suit within a suit.'"   *Pivnick v. White, Getgey, & Meyer Co., LPA*, 552 F.3d 479, 486 (6th Cir. 2009) (quoting *Marrs*, 95 S.W.3d at 860).   To prevail, "the plaintiff must show that he/she would have fared better in the underlying claim; that is, but for the attorney's negligence, the plaintiff would have been more likely successful."   *Marrs*, 95 S.W.3d at 860.

### A. Duty and Breach

With respect to the first element, duty, an attorney/client relationship existed between Sommer and Greene from December 12, 2013, to October 17, 2013.   [DN 15-10; DN 1-5.]   This relationship began when Sommer was employed at Bingham Greenebaum Doll, and continued when Sommer began practicing at FBT in February 2013.   Thus, from February 15, 2013, to October 17, 2013, Greene was a

Frost Brown Todd client.   When an attorney-client relationship exists, Kentucky law imposes a high standard of care:

> The relationship is generally that of principal and agent; however, the attorney is vested with powers superior to those of any ordinary agent because of the attorney's quasi-judicial status as an officer of the court; thus the attorney is responsible for the administration of justice in the public interest, a higher duty than any ordinary agent owes his principal.   Since the relationship of attorney-client is one fiduciary in nature, the attorney has the duty to exercise in all his relationships with this client-principal the most scrupulous honor, good faith and fidelity to his client's interest.

*Daugherty v. Runner*, 581 S.W.2d 12, 16 (Ky. Ct. App. 1978).   That standard is breached when "the attorney's act, or failure to act . . . depart[s] from the quality of professional conduct customarily provided by members of the legal profession.   *Id.* (citation omitted).

One way an attorney may breach this standard of care is by representing a client when a conflict of interest exists.   *See Woodruff v. Tomlin*, 616 F.2d 924 (6th Cir. 1980) (overturning district court's judgment n.o.v. in favor of defendant attorney in conflict of interest legal malpractice case).   The Kentucky Rules of Professional Conduct define the circumstances under which a conflict of interest arises.   Pertinent to this case, lawyers may not represent two clients when "the representation of one client will be directly adverse to another client."   Ky. S. Ct. R. 3.130(1.7)(a)(1).   This type of conflict is imputed to lawyers practicing in the same firm.   *Id.* § 3.130(1.10)(a).

By themselves, the Rules of Professional Conduct do not "give rise to a cause of action against a lawyer [in a civil case] nor [do they] create any presumption in

such a case that a legal duty has been breached." *Id.* § 3.130(XXI).   However, by their terms, "a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct" in a civil case.   *Id.*   This includes violation of the rules regarding conflicts of interest.   *See CenTra, Inc. v. Estrin*, 538 F.3d 402 (6th Cir. 2008).   Therefore, while Defendants' alleged violations of the Kentucky Rules of Professional Conduct cannot constitute the sole basis of Greene's cause of action, if such violations occurred, they may be considered as evidence that Defendants breached the standard of care imposed upon them by Kentucky law.

In this case, Defendants do not explicitly contest the fact that a conflict of interest existed during the period of time when FBT attorneys simultaneously represented Greene and UPS.   By representing Greene in his tax matter while also representing the employer who was seeking to terminate Greene, Defendants had a concurrent conflict of interest, prohibited by Supreme Court Rule. 3.130(1.7)(a)(1). Because FBT lawyers represented the adverse parties in unrelated matters, this conflict was waivable with informed consent, *see* Ky. S. Ct. R. 3.130(1.7)(b), but no waiver was ever sought from either client.   By simultaneously representing Greene and UPS, Defendants violated Kentucky's Rules of Professional Conduct.

Whether Defendants' violation of the Rules constitutes breach of their duty in this legal malpractice case, however, is a different question.   On this point, Defendants argue that Greene must offer expert testimony establishing how Defendants' conflict of interest breached the applicable standard of care.   Under Kentucky law, legal malpractice claims require expert testimony except "where the

negligence is so apparent that a layperson with general knowledge would have no difficulty recognizing it." *Stephens v. Denison*, 150 S.W.3d 80, 82 (Ky. Ct. App. 2004). Kentucky courts have required expert testimony in cases concerning trial preparation, trial strategy, and motions to vacate, *Gleason v. Nighswander*, 480 S.W.3d 926, 929 (Ky. Ct. App. 2016), qualified domestic relations orders, *Burton v. Helmers*, No. 2008-CA-001470-MR, 2009 WL 4021148, at *2 (Ky. Ct. App. Nov. 20, 2009), and an "attorney's professional assessment of the law," *Thomas v. Yost Legal Group*, No. 2004-CA-001723-MR, 2005 WL 2174430, at *4 (Ky. Ct. App. Sept. 9, 2005). In contrast, courts interpreting Kentucky law suggest that expert testimony will not be needed in cases where a statute of limitations was missed or a plea offer was not conveyed. *See Adkins v. Palermo*, No. 13-CV-136-HRW, 2014 WL 4542490, at *3 (E.D. Ky. Sept. 11, 2014). Whether an expert witness is required to prove a Kentucky legal malpractice claim is within the discretion of the trial court. *Gleason*, 480 S.W.3d at 929 (citation omitted).

Here, Greene alleges that by having a conflict of interest, Defendants breached the standard of care expected of attorneys. Expert testimony is not required to establish that Defendants violated the Rules of Professional Conflict in this case. Again, Defendants simultaneously represented Greene in his tax matter and UPS in its termination proceeding against Greene from August 22, 2013, to October 17, 2013. This constituted a concurrent conflict of interest prohibited by Ky. S. Ct. R. 3.130(1.7)(a)(1), and Defendants did not seek a waiver. Mere violation of the aforementioned rule is not conclusive of breach, but "a layperson with general

knowledge" could conclude that a reasonably prudent lawyer and law firm would have recognized this type of conflict. *Stephens*, 150 S.W.3d at 82. Expert testimony is not required to prove this type of breach.

## B. Causation

Next, Plaintiff must present a genuine issue of material fact on causation; that is, he must be able to show that Defendants' breach caused him to suffer damages. Greene advances two theories of causation and damages in this case. First, Greene asserts that "[b]ut for the negligence of Defendants, Mr. Greene's personal matters would not have been known to UPS and used against him in his termination matter, and Mr. Greene would have been more likely successful in mediating his conflict with UPS and avoiding termination." [DN 1 at 5-6.] Second, he claims that "[b]ut for the conflict of interest, Mr. Greene's dispute with the Kentucky Department of Revenue would have been more vigorously pursued by Mr. Sommer and more expeditiously resolved." [*Id*. at 6.] The Court will discuss these theories in turn.

### (1) *Greene's UPS Termination*

As mentioned earlier, a legal malpractice claim is a "suit within a suit"; to establish causation, the plaintiff must prove that he would have been more likely successful on the underlying claim. *Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003). With respect to Greene's first theory of causation, he must prove that, but for Defendants' conflict of interest, he would have been more likely to keep his job with UPS. For two reasons, he cannot do so. First, the System Board of Adjustment

determined that Greene was terminated in 2013 for failing to submit to a required medical examination.   This finding precludes Greene from establishing that he was terminated from UPS because of the tax investigation, which he must do to prevail on this theory.   Second, even if UPS had terminated Greene because of the tax investigation, the unchallenged evidence of record in this case demonstrates that UPS was aware of the investigation well before Defendants' conflict of interest arose.   Therefore, Defendants' conflict could not have caused Greene's termination.

Defendants first argue that the System Board's Award, which determined that Greene was terminated from UPS for failing to submit to a required medical examination, precludes Greene from re-litigating the cause of his UPS termination in this case.   The Sixth Circuit has set forth four elements that must be satisfied for collateral estoppel, also known as issue preclusion, to apply:

> 1) [T]he issue precluded must be the same one involved in the prior proceeding; 2) the issue must actually have been litigated in the prior proceeding; 3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; and 4) the prior forum must have provided the party against whom estoppel is asserted a full and fair opportunity to litigate the issue.

*Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 259 (6th Cir. 1991).[1]

---

[1] The Court recognizes that, alternatively, Kentucky collateral estoppel law could govern this particular issue.   Kentucky law governs Plaintiff's substantive legal malpractice claim in this diversity jurisdiction case, but the System Board's Award arose out of the Railway Labor Act and is governed by federal law.   *Intl. Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 684-86 (1963). If the application of collateral estoppel in this case is viewed as a matter of substance, Kentucky law governs; if the issue is viewed as procedural, federal law governs.   Ultimately, however, this distinction is immaterial.   Although the elements of collateral estoppel under Kentucky law are stated slightly differently, they are essentially the same as those found in federal jurisprudence. *See Swinford Trucking Co. v. Paducah Bank & Trust Co.*, 314 S.W.3d 310, 311 (Ky. Ct. App. 2010) ("The essential elements of collateral estoppel are: (1) identity of issues; (2) a final decision or judgment on the merits; (3) a necessary issue with the estopped party given a full and fair opportunity to litigate; and (4) a prior losing litigant.").   The only additional element that Kentucky law imposes is the requirement of a final decision or judgment on the merits.   Here, the System

Whether a labor arbitration may preclude the litigation of issues in subsequent common-law claims against third parties is not a question easily answered. The Supreme Court has held that arbitration under a collective bargaining agreement does not preclude suits to enforce federal statutory rights. *See, e.g.*, *McDonald v. West Branch*, 466 U.S. 284 (1984) (arbitration does not preclude suit under 42 U.S.C. § 1983); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981) (arbitration does not preclude suit under Fair Labor Standards Act); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) (arbitration does not preclude suit under Title VII). But those cases are distinguishable from the case at bar, which involves a tort suit arising under Kentucky law. The weight of authority holds that "an arbitrator's decision has preclusive effect in federal court," *Schreiber v. Phillips Display Components Co.*, 580 F.3d 355 (6th Cir. 2009), and that preclusive effect extends to common-law claims, *see Cent. Transp., Inc.* 936 F.2d at 261-62 (after arbitration decided breach of contract claim in defendants' favor, collateral estoppel barred plaintiffs' tortious interference claims). Thus, if the elements of collateral estoppel are satisfied, the System Board's Award will preclude Greene from contesting issues actually litigated and decided in the arbitration.

In support of their collateral estoppel argument, Defendants rely primarily upon the district court's opinion in *King v. Burlington Northern and Santa Fe Railway Co.*, 455 F. Supp. 2d 964 (N.D. Ill. 2006). In that case, Plaintiff Geraldine

Board's Award was final and binding, and adjudicated the merits of Greene's dispute with UPS regarding his 2013 termination. The remainder of the issue preclusion analysis is the same under either system.

King, a railroad ticket agent, was accused by her employer, BNSF, of stealing a number of passenger tickets and selling them for her own benefit. *Id*. at 966. The company filed criminal charges against King and also initiated termination proceedings. *Id*. Following two hearings, BNSF terminated King, and she appealed to the System Board of Adjustment. *Id*. at 967-69. The System Board upheld her termination, determining that BNSF had cause to believe that King had stolen the tickets. *Id*. at 969-70. Subsequently, BNSF declined to pursue the criminal case against King, and the criminal complaint against her was dismissed. *Id*. at 970. King then sued BNSF for malicious prosecution under Illinois law, which required her to prove that the prior criminal proceedings were instituted by BNSF without probable cause and with malice. *Id*. The court held that the System Board's "determination that Defendant had sufficiently convincing evidence to establish that Plaintiff had, indeed, stolen the tickets, precludes a determination in her favor on the issue of probable cause," and accordingly granted BNSF summary judgment. *Id*. at 976.

The Seventh Circuit upheld the district court's grant of summary judgment, but on different grounds. *King v. Burlington N. & Santa Fe Ry. Co.*, 538 F.3d 814 (7th Cir. 2008). The court "assume[d] for the sake of argument that the [System] Board is the type of tribunal whose findings may receive preclusive effect." *Id*. at 818. However, the court held that issue preclusion did not apply because, in its view, the issues were not the same. During the arbitration, the System Board determined only that BNSF "had established a convincing case" that King had

17

stolen the tickets, which differed from the probable cause standard required in King's malicious prosecution case. *Id.* Because the standard of proof with respect to King's culpability differed in each proceeding, the court held that the issue was not actually settled by the System Board's award.

*King* is distinguishable from the present suit because it involved the application of defensive mutual collateral estoppel. The parties in the first case (the arbitration) and the second case (the malicious prosecution suit) were identical. Here, Defendants seek to assert defensive non-mutual collateral estoppel, as they were not parties to the arbitration between Greene and UPS. "Mutuality between the parties is not required in defensive collateral estoppel cases so long as 'the plaintiff has had a full and fair opportunity to litigate the contested issue previously." *Ga.-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098-99 (6th Cir. 2012) (quoting *McAdoo v. Dallas Corp.*, 932 F.2d 522, 523 (6th Cir. 1991)). Thus, the fact that Defendants, non-parties to the System Board arbitration, seek to assert collateral estoppel against Greene is of no real consequence, as long as the four elements of issue preclusion are satisfied. *Cent. Trans., Inc.*, 936 F.2d at 259.

First, "the issue precluded must be the same one involved in the prior proceeding." *Id.* During the arbitration, "[t]he parties agreed upon the following statement of the issues for resolution: Was the grievant dismissed with just cause; if not, what is the appropriate remedy?" [DN 15-8 at 3.] Under the terms of the Collective Bargaining Agreement, UPS could only discharge Greene with just cause.

18

Thus, to decide this ultimate issue, Arbitrator Winograd had to determine why Greene was terminated, and whether that reason constituted just cause under the CBA.   Here, to recover from Defendants, Greene must establish, among other things, that their negligence proximately caused him to suffer harm.   *Marrs v. Kelly*, 95 S.W.3d 856, 860 (Ky. 2003).   Greene's first theory of causation is that "[b]ut for the negligence of Defendants, Mr. Greene's personal matters would not have been known to UPS and used against him in his termination matter, and Mr. Greene would have been more likely successful in mediating his conflict with UPS and avoiding termination."   [DN 1 at 5-6.]   In other words, to succeed on this theory, Greene must show that Defendants' conflict of interest caused UPS to become aware of his tax investigation, and that UPS terminated him because of that investigation.

However, the System Board's Award already decided the cause of Greene's termination.   Arbitrator Winograd found that UPS "had objective evidence" indicating that Greene's ability to fly might be impaired, [DN 15-8 at 49], and could therefore order him to take an additional medical examination under the CBA. Greene's refusal to do so was insubordinate, and "there is no dispute that gross insubordination after a clear order and warning of discipline is grounds for dismissal."   [*Id.* at 44.]   Thus, in upholding Greene's dismissal in its entirety, the System Board determined that Greene was terminated for refusing to submit to a required medical exam, and not for some other reason.   To prevail on his first theory, Greene must prove that his tax investigation, at the very least, contributed

19

to his dismissal by UPS.   But the cause of Greene's termination was already considered and decided by the System Board during Greene's labor arbitration.

Next, the cause of Greene's termination must have been "actually litigated" and a "critical and necessary part" of the System Board's Award.   *Cent. Transp. Inc.*, 936 F.2d at 259.   In this case, the parties presented extensive evidence and argument on the issue of just cause termination, and Arbitrator Winograd explicitly considered and rejected alternative reasons for Greene's dismissal by UPS, [DN 15-8 at 53].   And, as explained above, determining the cause of Greene's termination was necessary to determine whether his termination was supported by just cause. The second and third elements of collateral estoppel are satisfied in this case.

Finally, "the prior forum must have provided the party against whom estoppel is asserted a full and fair opportunity to litigate the issue."   *Cent. Transp. Inc.*, 936 F.2d at 259.   Here, the System Board of Adjustment held an arbitration lasting three days, heard testimony from several witnesses, and received numerous exhibits into evidence.   *See generally* [DN 15-8.]   All parties, including Greene, were allowed to call witnesses and to cross-examine witnesses called by the other side.   [*Id*. at 3.]   During the hearing, Greene was represented by counsel, and IPA also advocated on Greene's behalf.   After extensive post-hearing briefing, Arbitrator Winograd issued a fifty-six page decision detailing the reasons why Greene's termination should be upheld.   While the procedural safeguards afforded to Greene during the arbitration were not the same as those available to him in the more traditional setting of a trial, the law does not require such extensive

protections.   Rather, for collateral estoppel to apply, Greene need only have had "a full and fair opportunity to litigate the issue," *Cent. Transp. Inc.*, 936 F.2d at 259, and before the System Board, he had just that.   The Sixth Circuit has repeatedly held that arbitrations afford litigants an adequate forum in which to seek vindication of their legal rights.   *See, e.g.*, *id.* at 261; *Ivery v. United States*, 686 F.2d 410, 413-14 (6th Cir. 1982).   This case presents the Court with no reason to depart from this precedent.

Greene's case is similar to *M.J. Woods, Inc. v. Conopco, Inc.*, 271 F. Supp. 2d 576 (S.D.N.Y. 2003).   There, MJW approached Conopco to see if Conopco would be interested in licensing certain cosmetics inventions patented by MJW's founders. *Id.* at 579.   Those negotiations eventually fell through, but afterwards, Conopco's Vice President of Research and Development obtained a patent on a similar invention.   *Id.* at 580.   In its suit, MJW alleged that Conopco violated the Lanham Act, that Conopco's outside counsel, Pennie & Edmonds LLP, committed legal malpractice, and that both defendants engaged in state-law unfair competition and misappropriation of trade secrets.   *Id.* at 578.   The district court sent all claims except MJW's malpractice claim against P & E to arbitration.   *Id.*   The arbitrator determined that the defendants "had not breached or misused any confidential information nor had they misappropriated trade secrets."   *Id.*   P & E then moved for summary judgment on MJW's malpractice claim, arguing that the arbitrator decided in P & E's favor certain issues that MJW had to establish to prevail.   *Id.* at 578-79.

21

The district court agreed.  Although the arbitrator had not ruled upon the merits of MJW's malpractice claim, the court wrote that "certain issues that compromise the pertinent elements of the Malpractice Claim necessarily had to be decided by the Arbitrator in order to render judgment in regard to MJW's other claims that were properly before him."  *Id.* at 582.  Particularly, to succeed on its malpractice claim, MJW had to establish that an attorney-client relationship existed between it and P & E and that P & E's malpractice caused MJW to suffer harm.  *Id.* at 583.  But the arbitrator had already determined that P & E's state-law misappropriation claims were meritless because MJW was not P & E's client, *id.* at 584, and because P & E's actions caused MJW to suffer no harm, *id.* at 585-86.  Therefore, because those issues were already decided by the arbitrator, collateral estoppel prevented MJW from establishing the necessary elements to succeed on its malpractice claim.

The same is true here.  To determine whether UPS had just cause to terminate Greene, the System Board necessarily had to determine the cause of Greene's termination.   Greene had ample opportunity to litigate this issue and took advantage of that opportunity, but Arbitrator Winograd rejected his arguments.  Greene cannot now re-litigate the cause of his termination, when that issue was already decided during his arbitration.   Nor is this the proper case to argue that the System Board's Award is invalid, as Greene does in the bulk of his 118-page response.  *See generally* [DN 35.]  In *Greene v. IPA/UPS System Board of Adjustment, et al.*, No. 3:15-CV-00234, this Court upheld the System Board's Award

as valid under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, further strengthening the Court's conclusion in this case that collateral estoppel applies.

Even if the System Board's decision regarding the cause of Greene's termination were not binding upon this Court, the result would still be the same for one simple reason: the uncontested evidence of record demonstrates that UPS knew about Greene's tax investigation before FBT's conflict arose. UPS demonstrated affirmative knowledge that Greene was being investigated on September 7, 2010, when it responded to a subpoena requesting UPS records pertaining specifically to Greene. This was more than two years prior to Greene's hiring of Sommer, in December 2012, and Sommer's move to FBT, in February 2013. Even assuming, *arguendo*, that Greene is correct, and UPS used Greene's failure to submit to the medical exam as a pretext to fire him for his tax investigation, these Defendants could not have been the cause of his termination. FBT and its attorneys had a conflict of interest in this case, but that conflict could not have caused UPS to become aware of something it already knew.

In sum, Greene presents no genuine issue of material fact with respect to his first theory of causation. Because UPS was already aware of the Kentucky Department of Revenue's investigation into his personal tax matters well before his 2013 termination and before Defendants' conflict of interest, Defendants cannot have caused Greene's termination. Even if Greene's theory was logically possible, the System Board of Arbitration necessarily determined that Greene was

23

terminated for insubordination, and collateral estoppel precludes Greene from attacking that finding in this proceeding.

(2) *Greene's Tax Investigation*

Greene also advances a second theory of causation. According to Greene, "[b]ut for the conflict of interest, Mr. Greene's dispute with the Kentucky Department of Revenue would have been more vigorously pursued by Mr. Sommer and more expeditiously resolved." [DN 1 at 6.] As previously stated, Greene and his fellow UPS pilots were ultimately successful in fighting off the Kentucky tax assessments. [DN 15-8 at 13.] To prevail under this theory, Greene must prove that, despite his ultimate victory, he is still worse off than he would have been absent Defendants' conflict. Here, Greene claims that Defendants' conflict caused him to "incur[] additional costs of hiring new counsel to represent him in his tax matter, requiring substantial time and effort to review documents and get up to speed and creating an additional delay in resolving the matter." [DN 1 at 6.]

Under Kentucky law, a plaintiff in a professional malpractice case is typically required "to put forth expert testimony to inform the jury of the applicable . . . standard of care, any breach of that standard[,] and the resulting injury." *Blankenship v. Collier*, 302 S.W.3d 665 (Ky. 2010). Because Defendants' conflict of interest is the type of breach that could be recognized by a layperson, the Court does not believe that Greene must bring forth expert evidence to establish the element of breach in this case. *Stephens v. Denison*, 150 S.W.3d 80, 82 (Ky. Ct. App. 2004). However, to recover under his second theory, Greene must prove that, because of

24

the conflict, his tax attorneys either refused or were unable to take all appropriate steps towards the resolution of his tax dispute.   Such a claim necessarily implicates an "attorney's professional assessment of the law."   *Thomas v. Yost Legal Group*, No. 2004-CA-001723-MR, 2005 WL 2174430, at *4 (Ky. Ct. App. Sept. 9, 2005). Here, Greene does require expert testimony to show that Defendants' conflict of interest caused his tax matter to be resolved later than it should have, and at a higher expense.   *See Rogers v. Clay*, No. 2006-CA-000397-MR, 2006 WL 3691214 (Ky. Ct. App. Dec. 15, 2006) (upholding trial court's grant of summary judgment in legal malpractice case when plaintiff did not put forth expert evidence on causation element).   Defendants have submitted eight items of correspondence purporting to show that from December 2012 through October 2013, Sommer was negotiating with various officials regarding Greene's tax assessment.   [DN 15-13.]   Faced with this evidence, a layperson would require expert testimony to conclude that, because of Defendants' conflict of interest, Sommer did not act as a reasonably prudent attorney in seeking to resolve Greene's tax dispute.

This case was filed on September 9, 2014.   [DN 1.]   The deadline for expert disclosure passed on April 20, 2015, and the deadline for discovery passed on June 30, 2015.   [DN 12.]   Defendants filed the instant motion on July 29, 2015.   [DN 15.]   Thus, for more than a year, Greene has been on notice that expert testimony might be required to prove his attorney malpractice claim.   Despite this lengthy notice and the multiple extensions of time granted by this Court, Greene has failed to present any expert testimony or to state that he intends to obtain the same.

Because Greene's second theory of causation requires expert testimony, and because Greene has failed to bring forth any, no genuine dispute of material fact exists and summary judgment is appropriate.

## IV. Conclusion

The practice of law is a self-regulating profession.  To ensure the public's confidence in our judicial system, attorneys are expected to diligently follow the Rules of Professional Conduct.  In this case, the rules against concurrent client conflicts of interest prohibited Defendants from simultaneously representing UPS and Douglas Greene.  The record does not clearly explain why Defendants did not recognize this conflict, but in any event, they did not.  However, to recover from Defendants in this legal malpractice case, Greene must do more than show the mere existence of a conflict.  He must show that Defendants' conflict caused him to suffer harm.  Although Greene claims Defendant's conflict caused his termination from UPS, the System Board of Adjustment found otherwise.  That finding is entitled to preclusive effect in this case.  Even if it were not, Defendants have shown, and Greene has not rebutted, that their conflict of interest could not have made UPS aware of Greene's tax investigation.  UPS knew of the investigation well before Defendants' conflict arose.  Furthermore, Greene has not shown via expert testimony, as Kentucky law requires, that Defendants' conflict caused his tax dispute to be resolved more slowly or more expensively than it should have been.  No genuine issue of material fact exists with respect to Greene's sole claim of legal malpractice, and Defendants are therefore entitled to summary judgment.

An appropriate order will follow.

CC: Counsel of Record
Douglas Greene, *pro se*